**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

TERRY KEARNEY,

                         Plaintiff,                          Civil Case No.

             v.                                              **JURY TRIAL DEMANDED**

ROSWELL PARK CANCER INSTITUTE and            **COMPLAINT**
AMANDA ENGLERT, in her individual and
professional capacities,

                         Defendants.

Plaintiff Terry Kearney ("Ms. Kearney"), by and through her undersigned counsel, as and for her Complaint in this action against Defendants Roswell Park Cancer Institute ("Roswell" or the "Institute"), and Amanda Englert ("Ms. Englert"), in her professional and individual capacity, (collectively "Defendants"), alleges as follows:

### NATURE OF THE CLAIMS

1.      Plaintiff asserts claims against Defendants pursuant to 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL"), and New York Labor Law ("NYLL") §§ 740 and 741 ("Sections 740 and 741").

### JURISDICTION AND VENUE

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

4.      Ms. Kearney has and/or will file a charge of discrimination and retaliation in violation of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), arising out of the facts described herein, with the Equal Employment Opportunity Commission ("EEOC").  When the EEOC issues Ms. Kearney's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendants' violations of Title VII.

5.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

6.      Plaintiff Terry Kearney is a resident of the State of New York.   Ms. Kearney has been employed by Roswell from 2012 through the present.  At all relevant times, Ms. Kearney has been and is an "employee" of Roswell as that term is defined by the statutes at issue herein.

7.      Defendant Roswell Park Cancer Institute is a public benefit corporation under N.Y. Pub. Auth. Law Section 3553.1(a), and is located in the City of Buffalo, New York and the County of Erie, N.Y.   At all relevant times, Roswell has been and is an "employer" of Ms. Kearney as that term is defined by the statutes at issue herein.

8.      Defendant Amanda Englert, RN, MS, FNP, is a resident of the State of New York County, New York.  At all relevant times, Ms. Englert was employed by Roswell as the Assistant Director for Pre- & Post-Operative Services and Administrator for Cardiology and EKG, and supervised Ms. Kearney.  Ms. Englert actively and knowingly engaged in acts or omissions that aided or abetted discriminatory actions against Ms. Kearney.

**FACTUAL ALLEGATIONS**

9.      There are very few black individuals in positions of power at Roswell.

10.      Only two of the 14 members of the Board of Directors are black, and only two of the Institute's 22 Executives are black.

11.      One of the two black Executives is the Head of Human Resources, a position that is often reserved for minorities, generally pays far less than other executive positions and is not generally afforded discretion in important decision making.

12.      Roswell employs approximately three thousand five hundred (3,500) employees, of whom approximately three hundred (300) are black.

13.      Roswell employs approximately 300 physicians and scientists, including thirty (30) who are surgical oncology physicians.   Since 2008 through the present, Roswell has employed just nine (9) black physicians.   Presently, only five (5) black physicians are employed at Roswell.

14.      For years, the efforts of minority employees to boost diversity and ensure non-discriminatory hiring and promotion practices at Roswell have been undermined by the Institute's Executive team.

15.      Upon information and belief, in or around 2008, the Office of Federal Contract Compliance Programs ("OFCCP") audited Roswell for potential compliance violations related to the lack of diversity at the Institute and its inadequate Affirmative Action Program ("AAP").

16.      Upon information and belief, Roswell entered into a Conciliation Agreement with the OFCCP, promising to resolve these issues.

17.      Upon information and belief, as part of its purported efforts to resolve these issues, Roswell hired Reggie Clark as its Director of Diversity.

18.     Upon information and belief, including the letter attached hereto as Exhibit A, Mr. Clark encountered numerous barriers that prevented him from affecting any real change at Roswell, was discriminated against and ultimately resigned in 2010 because of his belief that Roswell was not committed to diversity.

19.     Following Mr. Clark's resignation, he sent a letter to then-Chief Executive Officer Donald Trump.  *See* Ex. A.  In this letter, Mr. Clark complained about "several conditions that hinder effective diversity and planning" and provided multiple examples, including inefficiencies in implementing Roswell's AAP, the Institution's refusal to provide Mr. Clark with the data necessary to ensure compliance with OFCCP and Equal Employment Opportunity ("EEO") requirements, discriminatory hiring and promotion practices and racist comments and conduct, among other issues.

20.     According to Mr. Clark, he was told by Jennifer Barr, then the Senior Director of HR Management, that the Institution was cautious when deciding whether to actually review data because, once the data was actually reviewed, Roswell would have to actually do something to resolve racial disparities.

21.     Mr. Clark also outlined numerous discriminatory acts committed by Vicki Garcia, who remains a Vice President of HR Management to this day.  Mr. Clark also complained that Roswell's General Counsel, Michael Sexton, declared his proposed EEO/AA Recruitment Plan illegal and refused to implement it.

22.     Clearly, Roswell's decision makers were not interested in actually resolving the systematic race discrimination at the Institute, which is reflected in the subsequent treatment of Ms. Kearney.

**Race Discrimination and Dangerous Patient Care**

23.     Ms. Kearney joined Roswell in 2012, and it quickly became clear that racism and improper and dangerous patient care were the practice, rather than the exception, at the Institute.

24.     Throughout her employment, Ms. Kearney – who, astonishingly, is the only black Registered Nurse at Roswell – was subjected to discriminatory disparate treatment at the hands of her supervisor, Ms. Englert.

25.     Among other actions, Ms. Englert would regularly counsel and chastise Ms. Kearney for purported mistakes, but did not counsel or chastise non-black nurses for the same conduct.

26.     By way of example, in 2015, Ms. Kearney was asked to re-take the Charge nurse class based on Ms. Englert's fabricated claim that she was not performing up to expectations in that role.

27.     Following this request, and fearing continued discriminatory micromanagement, Ms. Kearney requested that she no longer be assigned to the Charge nurse role.  Ms. Englert told Ms. Kearney that she must continue to accept Charge nurse assignments because she is in a "Nurse II" position.  However, Ms. Englert never required Kristen Hereth, another Nurse II, to take on the Charge nurse role.

28.     Ms. Englert also applies Roswell's time off policy in a discriminatory fashion and in violation of Roswell's Collective Bargaining Unit with Ms. Kearney's Union.  By way of example only, on multiple occasions Ms. Kearney has been refused a day off while another non-black nurse with *less* seniority was given the very same day off.

29.     Ms. Englert has also illegally interrogated Ms. Kearney regarding her occasional need for time off under the Family Medical Leave Act and conducted investigations into Ms. Kearney's Facebook.com profile in a futile attempt to catch Ms. Kearney in a lie.

30.     Ms. Englert is so hostile towards Ms. Kearney when she requests time off that Ms. Kearney has been forced to report to work even when extremely sick.

31.     In addition, Ms. Kearney was mandated (in violation of various federal and state laws) to work overtime *against her doctors' orders* upon her return from disability leave in March 2016.  She was also required to work a schedule that did not comport with her doctor's orders.  This put Ms. Kearney's safety, as well as the safety of patients, at risk.

32.     Ms. Englert has not subjected non-black nurses to this humiliating and harassing conduct.  Even Ms. Kearney's co-workers have commented upon the discriminatory treatment to which she is subjected, musing as to why Ms. Englert "picks on" Ms. Kearney and "what [Ms. Englert's] issue is with [Ms. Kearney]."

33.     Indeed, Ms. Englert does nothing when white nurses fail to update the PICIS system following changes in a patient's status.  This creates a dangerous situation in which doctors do not have access to the most updated information regarding their patients, including whether they are even still physically at Roswell.

34.     As another example of discriminatory conduct that compromises patient care, Ms. Englert will often require Ms. Kearney to step away from important tasks, such as charting, to handle completely unnecessary tasks for the sole purpose of embarrassing Ms. Kearney. Charting is particularly important because, again, it is the way that nurses ensure that patient records are complete and contain all necessary information.

35.     As yet another example, in March 2016, Registered Nurse Colleen Wilkie, who is white, gave one patient another patient's prescription – *i.e.*, she gave the patient the wrong prescription.   The danger presented by this sort of negligent conduct cannot be overstated. Fortunately for the patient, the Walmart employee who was asked to fill it caught the mistake. Unfortunately for the patient, the Walmart employee called the police because he believed that the patient stole the mishandled prescription.   Despite contemporaneously learning about this, Ms. Englert did absolutely nothing to discipline Ms. Wilkie or report the matter.   Instead, Ms. Engert swept this event under the rug and continued to treat her favorably as compared with Ms. Kearney because of her race.

36.     Indeed, later that same month Ms. Wilkie was permitted to take patient assignments despite being the daytime Charge nurse.   Ms. Englert regularly counseled Ms. Kearney against such conduct, but did not counsel Ms. Wilkie.   Moreover, Ms. Wilkie failed to keep her patients' PICIS status updated that day and was not counseled in any way.

37.     Most recently, on November 10, 2016, Ms. Kearney was assigned a patient by Ms. Wilkie.   When reviewing the patient's pre-operation orders, Ms. Kearney noticed that nurse Jennifer Russell had entered in the patient's pain score despite the fact that she had never seen the patient and the patient was still in the waiting room.   This is something that Ms. Russell has done on numerous occasions.   Ms. Englert was informed the same day, including by Ms. Kearney, but did nothing to reprimand Ms. Russell.

38.     Ms. Englert did nothing about this dangerous conduct even though she was aware of numerous other patient safety violations committed by Ms. Russell, including increasing the rate of an IV blood transfusion to 300 ml per hour, well about the 185 ml per hour limit in the Unit.   This is particularly dangerous because the Unit is not equipped or prepared to handle the

emergency health situations that can arise as a result of the increased rate of blood flow.  Again, the entire incident was swept under the rug.

**Complaints**

39.     Ms. Kearney repeatedly complained about the foregoing issues to Ms. Englert directly, as well as to Robin Hayes, the Executive Director of Perioperative Services, David Scott, Roswell's Director of Diversity and Inclusion and Brian Horsman, the Senior HR Administrator.

40.     Unfortunately, nothing was done to remedy the situation and the racism and dangerous patient care went ignored.

41.     Moreover, Ms. Englert has shared Ms. Kearney's complaints to others, including telling Nurse Carol Labby that Ms. Kearney has accused her of racism and that Ms. Englert can "hire who I want to hire and get rid of whoever I want to get rid of."

42.     Ms. Englert and Roswell also repeatedly retaliated against Ms. Kearney following each of her complaints.

43.     Ironically, despite being fully aware of the foregoing, in July 2016, Ms. Hayes nominated Ms. Englert for the OR Manager Emerging Leader and ASC Manager Awards, which were given out at the OR Manager Conference in September 2016.  Ms. Hayes touted Ms. Englert's "inherent and unique qualities that make for an affective [*sic*] manager."

**Retaliation**

44.     On November 11, 2016, following her many complaints of discrimination and the day after Ms. Kearney reported Ms. Russell's improper actions to Ms. Englert, Ms. Kearney was put on administrative leave and ordered to leave the building during the middle of her shift by Ms. Englert and Ms. Hayes.

45.     Ms. Kearney was not given a reason for this decision, and was told that her leave would be paid.

46.     On or around November 29, 2016, Ms. Kearney met with Brian Horsman, the Senior HR Administrator.  Ms. Kearney described to him much of the discrimination and patient safety issues outlined above, and further advised him of her prior complaints to Ms. Hayes.

47.     On December 1, 2016, Ms. Kearney sent Mr. Horsman a letter memorializing their meeting.

48.     The following day, Ms. Kearney met with and once again summarized her complaints of discrimination and dangerous patient care to Mr. Scott.  Mr. Scott advised that he would look into the issues and follow up with Ms. Kearney.  Mr. Scott also advised that he had received other complaints about Ms. Englert.

49.     Ms. Kearney received no follow-up from Mr. Scott for more than two months, and she was forced to follow up with him in a letter dated February 7, 2017.

50.     The letter again outlined the discrimination described above, as well as additional discriminatory acts.  The same day she sent this letter, Ms. Kearney's leave status was changed from paid to unpaid, and she remains on unpaid leave to this day.

**Facts Relating to Roswell's Corporate Status**

51.     Roswell is a public entity corporation as statutorily designated by N.Y. Pub. Auth. Law § 3553.1(a) ("There is hereby created a corporation to be known as the Roswell Park Cancer Institute Corporation which shall be a body corporate and politic constituting a public corporation.").  *See* N.Y. Const. art. X, § 5.

52.     As interpreted by New York courts, the phrase "body corporate and politic" refers to a wide variety of entities, and standing alone does not designate a public entity corporation as an alter ego or arm of the state.

53.     Officers and employees of Roswell are "deemed public officers or public employees, as the case may be, in the [New York State] civil service," as set forth in N.Y. Pub. Auth. Law § 3557.1, and "entitled to all the rights thereto as if such employee was a state employee subject to the pertinent provisions of the civil service law."  N.Y. Pub. Auth. Law § 3557.5.

54.     Under New York General Construction Law ("N.Y. Gen. Constr. Law"), § 65(b), a "public corporation" is defined as either a "municipal corporation," a "district corporation," or a "public benefit corporation," but the Legislature has not defined Roswell as a "municipal corporation," which includes "a county, city, town, village and school district," *see* N.Y. Gen. Constr. Law § 66(2), or a "district corporation" which includes "any territorial division of the state . . . whether or not such territorial division is expressly declared to be a body corporate and politic." § 66(3).

55.     Roswell is self-funded and, with the exception of the appointment of Roswell's directors by the governor and other state officials, is not under significant state control.[1]

56.     Importantly, New York is not liable for payment of any Roswell bonds or notes, *see* N.Y. Pub. Auth. Law § 3562, or budget deficits, and no New York statute indicates Roswell is structured in any other way than to be self-sustaining.  N.Y. Pub. Auth. Law § 3554 (10)-(13).

---

[1]     Elected NY officials appoint voting directors of Roswell and the governor appoints the chair of the board. N.Y. Pub. Auth. Law § 3553(1)(b), (3)(b).

Nor does any provision of state law make the state responsible for debts or other liabilities, such as judgments or budget deficits, incurred by Roswell Park either directly or indirectly.[2]

**A Cancer Research Hospital is Not an Exclusive Function of the State**

57.     Although Roswell Park is intended to benefit the people of the state of New York, its status as a public entity corporation does not, as a matter of federal law, designate it as an "alter ego" or "arm of the state" of New York for purposes of immunity.

58.     The operation and management of a cancer research facility and hospital, such as Roswell Park, is not an exclusive function of state or local government, nor is it traditionally a function performed by a state or local government.  Roswell Park shares the field with hundreds of other private health and cancer research institutions that similarly receive funding through federal and state providers, including Medicaid or Medicare.

59.     In the same way that private hospitals and cancer research companies operate, Roswell Park makes independent decisions about its employees and admission and treatment of patients.  It further executes its own contracts, leases, and other agreements, and is served by its own separate legal counsel and department.  Roswell Park does not perform a unique government function that merits its exemption from the discrimination laws at issue in this action.  Like its counterparts in the private sector, Roswell Park must be held to the provisions of the laws in its entirety.

60.     Although Roswell's directors and the chairperson of the board of directors are appointed by New York elected officials, their terms are defined for four to five years and once

---

[2]      On an annual basis, Roswell must submit an annual reporting of its operations and quarterly reports of its fiscal condition certain state officials, including the comptroller. N.Y. Pub. Auth. Law § 3568(4)-(5).

appointed, state lawmakers have no statutory right to oversight of board actions nor Roswell's management, much less authority over day-to-day activities or planning and operations.

61.     For purposes of the claims asserted by Ms. Kearney, Roswell is not a state agency and is not covered as an arm of the state under the particular statutes at issue.  Because New York is not responsible for judgments against Roswell, if punitive damages are awarded in this action, innocent taxpayers would not bear the costs.

62.     The New York legislature can exempt Roswell from liability under 42 U.S.C. § 1981 at any time, yet it has not done so.

63.     Having taken advantage of the benefits afforded to public entity status, Roswell is not entitled, absent express statutory authority, to take advantage of statutory exemptions intended to benefit entities offering essential services that traditionally fall under the auspices of the government.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Section 1981)**
**(*Against all Defendants*)**

64.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

65.     By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment because of her race and subjecting her to a hostile work environment because of her race.

66.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

67.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

68.     As detailed *supra*, Roswell was not acting as an alter ego of the state of New York.

69.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**
(***Against All Defendants***)

70.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

71.     By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of Section 1981, including, most recently, placing Plaintiff on unpaid leave.

72.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

73.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

74.     As detailed *supra*, Roswell was not acting as an alter ego of the state of New York.

75.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
*Against Roswell*

76.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

77.     By the actions detailed above, among others, Roswell has discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her race and subjecting her to a hostile work environment.

78.     As a direct and proximate result of Roswell's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

79.     As a direct and proximate result of Roswell's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of NYSHRL)**
*Against Roswell*

80.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

81.     By the actions detailed above, among others, Roswell has retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, placing Plaintiff on unpaid leave.

82.     As a direct and proximate result of Roswell's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

83.     As a direct and proximate result of Roswell's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation**
**in Violation of the NYSHRL)**
***Against Defendant Englert***

84.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

85.     By the actions described above, among others, Defendant Englert knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

86.     As a direct and proximate result of Defendant Englert's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

## SIXTH CAUSE OF ACTION
**(Whistleblower Retaliation in Violation of NYLL Sections 740 and 741)**
**(*Against Roswell*)**

87.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

88.     As detailed above, Roswell subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy or practice of Defendants that is in violation of a law, rule or regulation that creates a substantial and specific danger to the public health or safety, or which constitutes healthcare fraud.

89.     As detailed above, Roswell also subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy or practice of Defendants that constitutes improper patient care, as defined by NYLL Section 741.

90.     Roswell, by taking the aforementioned retaliatory actions against Ms. Kearney, violated NYLL Sections 740 and 741.

91.     As a result, Ms. Kearney seeks to recover actual damages, as determined at trial, and punitive damages, as allowed by law, together with her reasonable and necessary attorneys' fees, court costs and interests as allowed by law, and any further damages and equitable relief as determined by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F.      An award of liquidated damages;

G.      An award of punitive damages;

H.      Prejudgment interest on all amounts due;

I.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 9, 2017
       New York, New York                  Respectfully submitted,

                                          **WIGDOR LLP**

                                          By: _____

                                              Jeanne M. Christensen
                                            Michael J. Willemin
                                            Kenneth D. Sommer

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                        jchristensen@wigdorlaw.com
                                        mwillemin@wigdorlaw.com
                                        ksommer@wigdorlaw.com

                                        *Counsel for Plaintiff*